**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
mark@potterhandy.com
James M. Treglio (SBN 228077)
jimt@potterhandy.com
8033 Linda Vista Road, Suite 200
San Diego, CA 92111
(858) 375-7385
Fax: (888) 422-5191

Attorneys for Plaintiffs and the Class

## UNITED STATES DISTRICT COURT

## BY AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUISA GUTIERREZ, an individual, DEBBIE LUNA, an individual, on behalf of themselves and all persons similarly situated, | CASE NO. 3:19-cv-01345-DMS-AGS |
| | **CLASS ACTION** |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
| v. | **(1) THE CONSUMER LEGAL REMEDIES ACT (Civil Code § 1750, et seq.,)** |
| JOHNSON & JOHNSON CONSUMER, INC., a New Jersey Corporation, BAUSCH HEALTH US, LLC, f/k/a VALEANT PHARMACEUTICALS NORTH AMERICA LLC, a New Jersey Limited Liability Company, | **(2) THE FALSE ADVERTISING LAW (Business and Professions Code § 17500, et seq.,), and** |
| Defendants. | **(3) THE UNFAIR COMPETITION LAW (Business & Professions Code § 17200, et seq.)** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Louisa Gutierrez and Debbie Luna (collectively "Plaintiffs"), individually, on behalf of all others similarly situated (the "Class" or the "Class Members" as defined below), and on behalf of the general public, on information and belief, allege:

## INTRODUCTION

1.   This is consumer class action seeking restitution of all monies unlawfully earned by Defendants Johnson & Johnson Consumer, Inc., and Bausch Health US, LLC, f/k/a Valeant Pharmaceuticals North America, LLC (collectively, "Defendants") for the sale of their of baby powder containing talc and Shower to Shower® products (collectively, "Talcum Products"). Defendants have consistently informed the public, the Plaintiffs, and the Class Members that these products are safe enough for use on infants and for general household use, when in fact, Defendants have known for decades that not only do the Talcum Products contain numerous dangerous substances, including asbestiform fibers, lead, arsenic, and silica, but also Defendants have also known for decades that the methods they use to test talc in the Talcum Products for foreign and dangerous substances are and were inadequate.

2.   The reason for this deception is simple: Defendants know that any reasonable consumer would not purchase a product that contains or might contain dangerous substances such as asbestos, asbestiform fibers, lead, arsenic, or silica for use on their infants. As a result, Defendants have persisted in obfuscating the potential harm of the Talcum Products to Plaintiffs, the Class, and the general public.

3.   This is a class action alleging violations of the Consumer Legal Remedies Act ("CLRA"), Civil Code § 1750, *et seq*., the False Advertising Law ("FAL"), Business & Professions Code § 17500, *et seq*., and the Unfair Competition Law ("UCL"), Business & Professions Code §17200, *et seq*., that seeks, among other things, injunctive relief, restitution, and disgorgement to

1

remedy to a class of all purchasers of Talcum Products resulting decades of Defendants' on-going failure to warn and otherwise negligent, reckless and/or knowing sale of Talcum Products containing dangerous substances, including but not limited to, asbestos and talc containing asbestiform fibers, lead, arsenic, and silica, while making affirmative statements regarding the products, namely that it is safe enough for use on infants. This action further seeks to remedy Defendants' unfair, unlawful, and fraudulent business practices, and to ensure that all California consumers are properly informed about the potential harm these products can cause.

4.     Indeed, while it is not a part of this action, and Plaintiffs seek no remedy under Prop. 65 and its related statutes, Defendants were required as a matter of law to inform Plaintiffs and the members of the Class as defined below that their Talcum Products contained, or could contain, carcinogenic substances, namely asbestos, talc containing asbestiform fibers, lead, silica, and arsenic.

5.     As described below, Defendants have made several material misrepresentations about the safety of their products. For instance, one of the Talcum Products, is sold as "baby powder" and states on the bottle, "For over 125 years Johnson's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!" The bottle also states, "Hypoallergenic & tested with dermatologists." The Shower to Shower® product is stated as being an ideal solution for foot odor, washing hair, and keeping cool at night.

6.     While there have been a number of actions seeking individual recovery for injuries suffered because of prolonged use of the Talcum Products, Plaintiffs are unaware of any class action on behalf of a class of purchasers of the Talcum Products filed in the State of California.

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

7.     In accordance with Cal. Business & Professions Code §17203, ("Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure,") Plaintiffs bring this action on behalf of themselves, and all a class of persons similarly situated. The Class, as alleged herein, is defined as:

> Plaintiffs and all persons who purchased the Talcum Products within the state of California at any time from four years prior to the filing of this complaint and ongoing until date of judgment and/or preliminary approval of class action settlement.

Specifically excluded from the proposed Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the judicial officer or judicial officers assigned to this action, any member of the judicial officers' immediate family. Also excluded from the Class are any persons who, as of May 20, 2019, have an action pending in any Court within the State of California against one or more of the Defendants resulting the sale of and any injuries resulting from, any of the Talcum Products.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to pursuant to the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d), in that according to Defendant Johnson & Johnson Consumer Inc.'s Notice of Removal (1) the Class as defined above has 100 or more members; (2) the aggregate claim exceeds $5 million, exclusive of interest and costs; and (3) Plaintiffs and

3

the Class are citizens of the State of California, and Defendants are citizens of the State of New Jersey.

9.     At all relevant times, Plaintiffs are and were citizens of the State of California and purchased the Talcum Products in the State of California.  At all relevant times, the Talcum Products were manufactured, packaged in one centralized location from the same raw talc, and shipped to all fifty states. Thus, consumers that purchased and used the Talcum Products in any of the other 49 states outside of California would  be exposed to the same  hazardous substances as a consumer that purchased Talcum Products outside the State of California, and vice versa.

10.    The Court also has personal jurisdiction over the parties because Plaintiffs and the Defendants have submitted to the jurisdiction of the Court and Defendants have transacted business within this judicial district, in San Diego County and in the State of California; and the violations of law herein described have been committed within this judicial district, in San Diego County and in the State of California. Moreover, by doing business in this judicial district and committing violations of the California Civil Code and the California Business and Professions Code in this judicial district, Defendants' conduct has had an adverse effect upon the finances of residents of this judicial district.

## THE PARTIES

### Plaintiffs

10.    Plaintiff Louisa Gutierrez is a citizen of the State of California, and a resident of Riverside County. On a regular basis for the past thirty years, Plaintiff Louisa Gutierrez purchased the Talcum Products in the State of California until she became aware of the connection between the Talcum Products and health hazards at the end of 2018 by reading, amongst other stories, the report by Reuters that the Talcum Products contained asbestos

4

and/or talc containing asbestiform fibers. Had Plaintiff Louisa Gutierrez been aware that the Talcum products contained, or could contain asbestos, lead, arsenic, silica, and/or talc containing asbestiform fibers, Plaintiff Louisa Gutierrez would never have purchased or used any of the Talcum Products.

11.   Plaintiff Debbie Luna is a citizen of the State of California, and a resident of San Diego County. Plaintiff Debbie Luna purchased the Talcum Products in the State of California for herself and her infant child until she became aware of the connection between the Talcum Products and hazardous substances at the end of 2018 by reading, amongst other stories, the report by Reuters that the Talcum Products contained asbestos and/or talc containing asbestiform fibers. Had Plaintiff Debbie Luna been aware that the contained, or could contain asbestos, arsenic, lead, silica, and/or talc containing asbestiform fibers, Plaintiff Debbie Luna would never have purchased or used any of the Talcum Products. Nor would Plaintiff Debbie Luna use a product containing lead on her infant child.

**Defendants**

12.   Defendant Johnson & Johnson Consumer, Inc., ("Johnson & Johnson") is a New Jersey corporation that is transacting and conducting substantial business within the State of California. Johnson & Johnson mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce Baby Powder products which contain or contained numerous hazardous substances including asbestos, lead, asbestiform fibers, arsenic, and/or silica, all while informing Plaintiffs, the Class, and the general public that the baby powder product was safe for use on infants, children, and adults.

13.   Defendant Bausch Health US, LLC, formerly known as Valeant Pharmaceuticals North America, LLC, ("Bausch") is a New Jersey limited

liability company that is and was doing business in the State of New Jersey and in the State of California. Bausch purchased from Johnson & Johnson the Shower to Shower® product line in and around 2013. Since 2013, Bausch has not made any substantial changes to the Shower to Shower® product line, and keeps and maintains the same talc supplier as Johnson & Johnson. Bausch, mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce Shower to Shower® products which contain or contained numerous hazardous substances including asbestos, asbestiform fibers, arsenic, lead, and/or silica, all the while informing the public that the Shower to Shower® products were safe for general household use.

14.   At all pertinent times, Defendants Johnson & Johnson and Bausch were engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the Talcum Products containing numerous hazardous substances such as asbestos, talc containing asbestiform fibers, lead, arsenic, and/or silica. At all pertinent times, Johnson & Johnson and Bausch regularly transacted, solicited, and conducted business in all States of the United States, including the State of California.

15.   Johnson & Johnson and Bausch have derived substantial revenue from goods and products purchased and used in the State of California. Johnson & Johnson and Bausch expected or should have expected its acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

16.   At all pertinent times, Johnson & Johnson and Bausch utilized the same source of talc from a supplier in China which mined, milled, and processed talc, which Defendants then imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce the Talcum Products containing

6

numerous hazardous substances, such as asbestos, talc containing asbestiform fibers, arsenic, lead, and/or silica.

## **FACTUAL BACKGROUND**

A.    <u>Historical Background</u>

17.    For decades, Defendants have manufactured the Talcum Products containing asbestos and talc containing asbestiform fibers that were and are continuing to be sold and marketed as safe for daily use by consumers to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. Defendants' Talcum Products were advertised as healthful for babies, children and adults and to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

18.    Defendants and the Cosmetic, Toiletry & Fragrance Association (n/k/a Personal Care Products Council) ("CTFA") made false statements to Plaintiffs, the Class, the general public, news media and government agencies that exercise regulatory authority over the cosmetic industry, including, but not limited to, the U.S. Food & Drug Administration ("FDA"), the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHS"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused Plaintiffs' and the Class Members' harm through intentional efforts to deceive the general public and regulatory authorities as to the safety of the Talcum Products.

20.    Defendants and CTFA, for decades, possessed medical and scientific data that raised concerns regarding the presence of hazardous substances, including asbestos and talc containing asbestiform fibers in the Talcum Products and that demonstrated the existence of health hazards to those exposed to asbestos and talc containing asbestiform fibers.

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

21.   Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. It is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in the Talcum Products, talc is known as "talcum powder."

22.   Geologists, Defendants and CTFA-and. their suppliers, experts, agents and advisors-have long known that the deposits in the earth that are associated  with  talc are also associated with the formation of asbestos. "Asbestos" is a commercial and legal term, rather than a  geologic  or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and amphibole minerals such as actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

23.   Defendants and their talc suppliers, which have been and still are the largest talc producers and/or talc-containing product manufactures in the world, admit that they have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of carcinogens, including asbestos and asbestiform talc, in talc and talc deposits.

24.   Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly contaminated with substances known or suspected of being hazardous, such as asbestos, silica, quartz, nickel, lead and arsenic. Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc,

8

including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

25.   Defendants and their affiliates, employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated, "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council published studies which noted, "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National Safety News, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

26.   In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" that found "exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material, offers another type of dust which may cause fatalities among workers." In 1958, The New York Department of Labor published Industrial

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

27.   In 1968, a study presented at the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits ...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., Fibrous and Mineral Content of Cosmetic Talcum Products, 29 AM. IND. HYG. Assoc. J. 350-354 (1968). Defendants were aware of these findings.

28.   In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association. Defendants were aware of this study. The study revealed that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite and chrysotile. The study explained that such fibrous content was not unexpected because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some talcum powders contained asbestos, there is no evidence that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

29.   According to a December 2018 report by Reuters, by at least 1967 and 1969, Defendants investigated the existence of tremolite in its Talcum Products, finding that asbestiform fibers were commonly found in its Talcum Products. From the report:

> In 1964, J&J's Windsor Minerals Inc subsidiary bought a cluster of talc mines in Vermont, with names like Argonaut, Rainbow, Frostbite and Black Bear. By 1966, it was blasting and bulldozing white rock out of the Green Mountain state. J&J used the milled powder in its cosmetic powders and sold a less-refined grade to roofing, flooring and tire companies for use in manufacturing.
>
> Ten years after tremolite turned up in the Italian talc, it showed up in Vermont talc, too. In 1967, J&J found traces of tremolite and another mineral that can occur as asbestos, according to a table attached to a Nov. 1, 1967, memo[1] by William Ashton, the executive in charge of J&J's talc supply for decades.
>
> J&J continued to search for sources of clean talc. But in an April 9, 1969, memo[2] to a company doctor, Ashton said it was "normal" to find tremolite in many U.S. talc deposits. He suggested J&J rethink its approach. "Historically, in our Company, Tremolite has been bad," Ashton wrote. "How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?"
>
> Since pulmonary disease, including cancer, appeared to be on the rise, "it would seem to be prudent to limit any possible content of Tremolite ... to an absolute minimum," came the reply from another physician executive days later.
>
> The doctor told Ashton that J&J was receiving safety questions from pediatricians. Even Robert Wood Johnson II, the founder's son and

---

[1] Attached hereto at Exhibit 1.

[2] Attached hereto at Exhibit 2.

11

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

then-retired CEO, had expressed "concern over the possibility of the adverse effects on the lungs of babies or mothers," he wrote.

"We have replied," the doctor wrote, that "we would not regard the usage of our powders as presenting any hazard." Such assurances would be impossible, he added, "if we do include Tremolite in more than unavoidable trace amounts."

The memo is the earliest J&J document reviewed by Reuters that discusses tremolite as more than a scratchy nuisance. The doctor urged Ashton to consult with company lawyers because "it is not inconceivable that we could become involved in litigation."

Lisa Girion, "Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder," Reuters (December 14, 2018), https://www.reuters.com/investigates/special-report/johnsonandjohnson-cancer/.

30.    A 1976 follow-up study conducted by researchers at Mount Sinai Hospital New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc ...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, 2 J. TOXICOL. ENVIRON. HEALTH 255-284(1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post, and Defendants were aware of same.

31.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on talc-containing products. Defendants and CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in

12

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

concert to block efforts to label and warn consumers regarding the dangers (including Asbestos and talc containing asbestiform fibers hazards) associated with cosmetic talcum powder products, such as Defendants' The Talcum Products.

32.   In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction ("XRD") analysis, and found them to contain 5-25% tremolite and anthophyllite asbestos.

33.   Soon thereafter, a symposium was held in August of 1974 at the FDA to discuss the issue of asbestos content of talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital, which was then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard:  that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through TEM and electron diffraction. Defendants and CTFA, aware of the foregoing and citing costs as well as their fear ·of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos, asbestiform talc and other carcinogens.

34.   After this 1971 symposium, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc.

13

The results, however, were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy, and electron diffraction must be used to detect asbestos in talc and talcum powders.

35.    Dr. Lewin of New York University disclosed twice in 1972 that asbestos had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of 195 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one of both. XRD had been used as the first step in analysis and the presence of asbestos and was verified by the use of optical microscopy to disclose the presence of significant numbers of fibers. Shortly thereafter, Dr. Lewin reported to Whittaker, Clark & Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that "1615" talc contained I % chrysotile and that "4615" talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that nine of fourteen samples contained chrysotile. Only five samples did not have detectable levels of chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

36.   A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from the Italian, Montana I & 11, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December I0, 1973, CTFA report also showed that several laboratories had reported chrysotile in many of the talc samples sent by the CTFA for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

37.   In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including Defendants and their talc suppliers, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Talc Defendants' products. On September 3, 1973, the FDA sent CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing X-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed rule. Minutes of CTFA's Talc Subcommittee meeting on March 15, 1976, indicate that the FDA's "Dr. Shaffner suggested the possibility of having industry report periodically on the

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

results of its analysis to the FDA." Dr. Estrin of CTFA responded "the subcommittee would give serious consideration to this suggestion."

38.   Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be completely free of asbestos. These were some of the same "grades" of talc used by Defendants.

39.   The talc industry's response, including that of the Defendants, was swift and well-coordinated through CTFA, with which the Defendants conspired and worked in concert to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos in talc and block efforts to label and warn consumers regarding the dangers associated with the talc products, including Defendants' Talcum Products.

40.   Regarding the FDA's proposed 1972 rule-making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Schaffner explained that he was duty-bound and must publicize the brand names of the talcum powders that contained asbestos. CTFA's president, Dr. Merritt, strongly objected to the FDA alerting the general public and publishing the brand names of the talcum powders, as it would cause the manufactures "economic hardship." Merritt also threatened to sue the FDA to prevent the disclosure of the brand names. As a result, the FDA, Defendants and CTFA never revealed or publicized the brand names of the talcum powders that contained asbestos, much to the detriment of the Plaintiffs, the Class Members, and the general public.

41.    In  1973,  CTFA  created  a  talc  subcommittee  and  the Scientific  Advisory  Committee  to  develop  a  testing  methodology  for detecting asbestos in talc. Initially, CTFA designated a group of its members to  tests  talc  grades  used  in  talcum  powder  utilizing  the  methodology proposed  by  the  FDA  in  its  notice  of  rulemaking.  Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked  with  tremolite  and  chrysotile,  were  circulated  among  the  members, including  representatives of Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including  the  spiked  sample),  and  one  found  asbestos  only  in  the  spiked sample.  In  conclusion,  all  members  agreed  that  the  best  and  most  reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and  electron  diffraction. The  same  members, however,  dispensed  with  this analytical  method,  claiming  TEM  and  electron  diffraction equipment was too expensive, despite  Defendants  then  owning or having  unfettered  access to same.

42.    From there, the difference between what Defendants and CTFA knew diverged from what they were representing to the FDA. Defendants, CTFA  and  others  in  the  industry  knew  that  there  was  no  such  thing  as asbestos-free  talc--only  talc  in  which  asbestos  could  not  be  detected  using the prevailing, most economic analytical  methodology, XRD, which at the time could  not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

43.    Defendants and the CTFA also did not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and even if they were testing, it was done so superficially:  only  four  or  so  grams  per  20  tons  of  pre-shipment  and  pre-processed talc, as an example. Defendants and CTFA also failed to the inform

17

the FDA that they were not testing off-the-shelf talc powder products, but rather old samples that were never from the end products themselves. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that are commonly found in talc deposits. What is more, to the extent Defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, CTFA sent letters to the FDA in March of 1976 fraudulently claiming that industry testing had shown all talcum powder products to be completely free of asbestos.

44.   Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned that CTFA, Defendants and the cosmetic industries were slow to address the issue of asbestos in talc and talcum powders. Defendants had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a reliable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos or asbestiform-talc.

45.   Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study that demonstrated that some of Defendants' talcum powders contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc ...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were known to the Defendants and published the same year by the New York Times and the Washington Post.

46.   Defendants and CTFA responded to these developments by falsely claiming that the industry was doing "everything" it could to solve the problem;

issuing press releases falsely claiming that chrysotile had never been found in talcum powders; and intentionally suppressing data that showed tremolite was commonly found in talc and talcum powder.

47. CTFA subsequently began in earnest to produce a voluntary protocol and methodology that would provide Defendants cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder contained asbestos, Defendants and CTFA falsely represented that talcum powders have never contained asbestos or asbestiform-talc.

48. Defendants, their talc suppliers, and third parties funded by Defendants collectively met with and corresponded with CTFA, as well as collectively met with the FDA and other government agencies, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method that -- was developed collectively by Defendants and CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products -- was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of the testing methods. Defendants and CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as the Talcum Products to which Plaintiffs and the Class were exposed.

49. In support of its voluntary XRD methodology, which was finally published in 1977, CTFA produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. CTFA, Defendants and other talc product producers, however, never informed the FDA of the hundreds of

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

1  positive tests showing talc and talcum powders contained asbestos and other
2  carcinogens.

3      50.   CTFA "Method J4-I," published on October 7, 1976, states that
4  TEM-SAED "offers greater sensitivity, but is not presented since it is
5  unsuitable for normal quality control applications." The published method,
6  rather, relies on XRD with "the level of detection of amphibole by this method
7  [being] 0.5% and above." CTFA met with and corresponded with Defendants
8  and third parties, to individually and collectively advocate to the FDA for the
9  use of inadequate XRD testing on miniscule portions of the tons of talc
10 obtained from the mining sources to be used in the consumer products,
11 followed by fewer "periodic" tests by TEM. This voluntary method was
12 developed by CTFA and Defendants, and was advocated to the FDA by CTFA
13 and Defendants in lieu of regulations requiring labeling and warnings on
14 talcum powder products, even though CTFA and Defendants knew that the J4-
15 l method would not reveal the true level of asbestos in the talc that reached
16 consumers. In fact, the first "round robin" tests, which analyzed a "CTFA
17 Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to
18 detect the tremolite. In other words, 84% of the industry's laboratories failed
19 to detect asbestos in a sample known to contain tremolite asbestos while using
20 the CTFA's own J4-1 method. There is no evidence that CTFA or Defendants
21 ever shared this remarkable failure with the FDA or the public.

22     51.   Minutes of CTFA's Talc Subcommittee from February 24, 1975,
23 stated "It was agreed, however, that chrysotile is never found in cosmetic talcs,
24 based on numerous analyses by several investigators ..." When referring to the
25 challenge of chrysotile detection, an article entitled "Talc" in the
26 January/March 1976 CTFA Cosmetic Journal, states that "The only known
27 backup method for a positive identification in this event, is [TEM] with
28 selected area diffraction." However, "despite many efforts, the committee had

been unable to find a sample of cosmetic talc containing naturally occurring asbestos ...it was asked, 'Why should we test for chrysotile if there isn't any?"' CTFA's Specification for Cosmetic Talc, revised on October 7, 1976, falsely represented that no fibrous asbestos was detected in cosmetic talc. Even after 1976, CTFA and Defendants continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos and other carcinogens in the talc being used to manufacture cosmetic products. However, CTFA and Defendants continued to represent that no asbestos was detected in cosmetic talc. These material representations adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos and regulate cosmetics. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because CTFA represented that its "ultra-sensitivity could be a problem" and that it was too expensive to use. Instead, its J4-l method relied on XRD alone for detection of asbestos at greater concentrations than 0.5%, a concentration that could allow more than a billion asbestos fibers per gram of talc to be passed off as "asbestos-free ."

52. Defendants and CTFA made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers in the Talcum Products was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA, CalEPA, OEHHA and other governmental agency regulations that, like California's Proposition 65, would have required them to place warnings regarding the asbestos and talc containing asbestiform fibers content of their Talcum Products, and thereby inform the public including Plaintiffs and the Class Members, that their Talcum Products contain hazardous substances such as asbestos and talc containing asbestiform fibers.

53.   CTFA then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them found chrysotile. The article and report failed to disclose whether the talcum powders tested contained tremolite, anthophyllite or any other form of asbestos. This publication of half-truths was conveyed to the FDA and the public with the purpose of preventing regulations of cosmetic products. Thereafter CTFA's methodology became the standard by which nearly all talc was analyzed by the entire industry, including talc used in cosmetic and hygiene products today.

54.   CTFA and Defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" does not mean the product does not contain asbestos, but due to Defendants' repeated conflation of the terms, the public been lead to believe that the Talcum Products are safe when, in fact, they contain numerous hazardous substances. Furthermore, since Defendants and CTFA did not have sufficient testing protocols in place to support the claims that Talcum Products, were safe or asbestos-free, such statements were recklessly made, as they had no reason to believe them.

55.   Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of 'their existence is only because of civil litigation.

56.   Defendants and CTFA's failure to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, even when various government agencies, including California's Environmental Protection Agency ("CalEPA") and Office of

Environmental Health Hazard Assessment ("OEHHA") and others, raised concerns about the safety of talc, including the issue of asbestos content.

57.   To this day, many talc-containing products presently on the market, including the talcum products contain asbestos and talc containing asbestiform fibers. Instead of publicizing this fact, Defendants and CTFA continue to deny all the above to protect their pecuniary interests, to the severe detriment of the public, including Plaintiffs and the members of the Class.

58.   Since at least 1979, Defendants have conducted a campaign··to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that Talcum Products are safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including asbestos and other carcinogens in talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today, asbestos-containing talc in cosmetics has not been banned or otherwise regulated by CTFA or the FDA.

59.   Defendants (and other entities in the talc industry and cosmetic industries, including the CTFA), individually and collectively, failed to report to the FDA, CalEPA, OEHHA and other regulatory agencies, tests performed both internally and by outside laboratories confirming the presence of asbestos and talc containing asbestiform fibers in both their finished products, including the Talcum Products, as well as talc shipments from suppliers Defendants obtained talc from and other sources that were used to produce finished products.

60.   Defendants, and even the outside laboratories, including McCone Associates, sent letters to CTFA, to be and which were forwarded to

23

the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphibole or chrysotile asbestos, when in fact all of these entities had received or performed tests indicating the contrary when such false representations were made.

61.   After 1976, Defendants and CTFA continued to obtain and/or receive results of testing performed internally and externally indicating the presence of hazardous substances in the Talcum Products.

62.   Defendants and CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to Plaintiffs and the Class regarding the hazards of exposure to carcinogens, including asbestos, talc containing asbestiform fibers, arsenic, lead, and silica, from the Talcum Products.

64.   Defendants and CTFA, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including the Talcum Products, to which Plaintiffs and the Class Members have been exposed.

65.   Defendants and CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large in this State and elsewhere, including Plaintiffs, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

66.   Defendants and CTFA conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

a.  to withhold from users of their products including Plaintiffs, and the Class, and from persons who they knew and should have known would be exposed thereto--information regarding the health risks of inhaling and/or ingesting and/or perineal (genital) application of the Talcum Products;

b. to eliminate, suppress or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

c.  to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

d.   to falsely represent that talc and talcum powder products, including those of Defendants, were safe and healthful for use by consumers such as Plaintiffs and the Class.

67.   Plaintiffs and the Class reasonably, and in good faith, relied upon the false and fraudulent representations made by Defendants and CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens, and he was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

68.   CTFA, as well as Defendants and other entities in the talc industry and cosmetic industries, individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in Defendants' and other CTFA members' finished products as well as talc shipments from talc suppliers and other sources that

25

were used to produce finished products. Instead, CTFA sent letters to the FDA stating that results of testing of talc used by the industry after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such intentionally false misrepresentations were made. CTFA and Defendants made and published such representations claiming that their collective testing method was adequate, they were ensuring that talcum powder products, including The Talcum Products, were safe, and that their testing of talc reaching consumers was "safe," despite knowing the contrary.

69. The FDA, CalEPA, OEHHA, other regulatory bodies, and ultimately Plaintiffs and the Class, directly and/or indirectly relied upon CTFA's and Defendants' false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states: "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding CTFA's and Defendants' misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, on July l, 1986, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole..." CTFA's J4-l method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry, including Defendants,

continues, four decades later, to use and promote its antiquated and wholly inadequate J4-I method.

70.    CTFA and Defendants, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale,  marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public regarding the hazards of exposure to asbestos and talc with asbestiform fibers and other carcinogens from talc and talc-containing products, including the Talcum Products.

71.    CTFA and Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Plaintiffs and the Class, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion and/or perineal (genital) application of asbestos and talc containing asbestiform fibers from their Talcum Products.

72.    CTFA and Defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated, and misleading scientific data, literature, and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, and specifically talc and talcum powder used in the production of the Talcum Products to which Plaintiffs and the Class were exposed.

73.    CTFA and Defendants, through agreement and consciously parallel behavior, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and  talc- containing products, including Defendants' the Talcum Products to which Plaintiffs and the Class were exposed.

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

74. As recently as 2016, Defendants made material misrepresentations to the FDA regarding the safety of their Talcum Products. Despite those recent representations, the Plaintiffs in *Hermelinda Luna, et al., v. Johnson & Johnson, et al.,* U.S. District Court for the Central District of California Case No. 2:18-cv-04830, indicated that there was evidence that the Talcum Products contained not just asbestos and talc containing asbestiform fibers, but also arsenic, lead, and silica.

B.   Defendants' Continuing Efforts to Deceive the Public

75. To the Plaintiffs, and the Class, and the general public, Defendants made and continue to make material misrepresentations regarding the safety of their products. Johnson & Johnson, for instance, labels one of the Talcum Products as "baby powder" and utilizes advertisements with babies to indicate that the Talcum Product is safe enough to use on an infant. It further compounds that statement by stating explicitly on the bottle that, "For over 125 years Johnson's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!" The bottle also states, "Hypoallergenic & tested with dermatologists." These affirmative statements, including the very name of the product, "Baby Powder," are all designed to give the impression that the Talcum Products are safe for use.

76. Additionally, Johnson & Johnson has engaged in an extensive marketing campaign, utilizing social media websites, such as Twitter and Facebook, to proclaim that the Talcum Products are safe for use.

77. For instance, Johnson & Johnson has published a webpage entitled "5 Important Facts about the Safety of Talc," https://www.jnj.com/our-products/5-important-facts-about-the-safety-of-talc, which states that its Talcum Products are safe, but neglects to mention that the Talcum Products may contain asbestos, asbestiform fibers, arsenic, lead, and silica. Additionally, Johnson & Johnson also published and continues to update a website dedicated

28

to asserting that the Talcum Products are safe, https://www.factsabouttalc.com/. Johnson & Johnson advertises these webpages and websites through social media, including Twitter.

78.   In these advertising efforts on the internet, Johnson & Johnson has also undertaken a decades long effort to convince the public that its products, particularly those products geared towards infants are safe to use. For instance, in one television commercial, "Gentle is Everything,"[3] which aired during the Class Period, Johnson & Johnson indicates that it reformulated its products for ultimate safety. In another, "Your Whole Life,"[4] which aired during the Class Period, Johnson & Johnson states that it provides products to keep its users safe throughout their entire lives. In another[5], Johnson & Johnson states the supposed benefits of baby powder, and that it is safe for use on an infant.

79.   Further the bottles of the Talcum Products consistently make affirmative statements that their products are safe for use.  One bottle of "baby powder" states on the bottle, "For over 125 years Johnson's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!"  The bottle also states, "Hypoallergenic & tested with dermatologists." Another bottle of "baby powder" states, "**We love babies**. JOHNSON'S® Baby Powder leaves skin feeling delicately soft and dry while providing soothing relief." (Emphasis not added).

80.   Bausch has similarly attempted to continue to deceive the public about the safety of the Talcum Product. The bottles of Shower to Shower® products and their website, https://www.showertoshower.com/, both state "For nearly 50 years SHOWER TO SHOWER® Absorbent Body Powders have delivered long-lasting freshness. Our silky-soft powder pampers your skin,

---

[3] Found here: https://www.ispot.tv/ad/d6rT/johnsons-baby-choose-gentle
[4] Found Here: https://www.ispot.tv/ad/oAaF/johnson-and-johnson-your-whole-life
[5] https://youtu.be/aXxngz-DbOM

29

while our unique absorption formula keeps you feeling drier longer." The website describes the "power of powder" and encourages the use of Shower to Shower® products to prevent foot odor, to use as a shampoo substitute, to help keep sand from clinging to the user's body when at the beach, to keep cool in the summer, and to "Lightly dust your sleepwear or sheets to make bedtime peaceful and luxurious."[6]

81.    The end result of these advertisements is clear – to affirmatively represent that all Talcum Products are completely safe to use. And indeed, Defendants need the public to believe that the use of such products is completely safe. As one FDA official put it, "No mother was going to powder her baby with 1% of a known carcinogen irregardless [sic] of the large safety factor."[7] However, as alleged above, these products contain substances such as asbestos, asbestiform fibers, lead, silica, and arsenic, which are known to cause serious harm.

82.    What Defendants' marketing does not state is that Johnson & Johnson is currently facing over 14,000 different lawsuits for injuries associated with the use of Talcum Products. Nor does Defendants' marketing indicate that talc samples extracted from Defendants' Chinese supplier contained asbestos, asbestiform fibers, lead, arsenic, and silica, all of which are known to be hazardous.

83.    Further, Defendants both list the ingredients of the Talcum Products on their bottles, listing talc as an ingredient. In nowhere on the ingredient list do Defendants list asbestos, arsenic, lead, silica, or other substances which are found in Defendants' products. This, too, is a common scheme to deceive and confuse the public regarding the safety of the Talcum Products.

---

[6] https://www.showertoshower.com/The-Power-of-Powder
[7] See Exhibit 3.

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

84.    Despite knowing that the Talcum Products contain such substances, Defendants failed to notify the California Safe Cosmetics Program that the Talcum Products contain ingredients suspected to cause cancer (asbestos, arsenic, talc containing asbestiform fibers, silica), birth defects (lead), or other reproductive harm, in violation of the California Safe Cosmetic Act of 2005 (Cal. Health & Safety Code § 111791, *et seq*.). The California Safe Cosmetics Act is a California State law that was enacted in 2005 and is implemented by the California Safe Cosmetics Program in the California Department of Public Health. The Act requires companies to report cosmetics products sold within the state that contain ingredients known or suspected to cause cancer, birth defects, or other reproductive harm. The purpose of the act is to inform governmental entities and allow them to take action to prevent the sale of such products if they are deemed dangerous. By failing to comply with the law and preventing such governmental action, Plaintiffs and the Class Members are and were deceived by Defendants' conduct in that they, like reasonable consumers, expected that governmental entities would prohibit the sale of products containing harmful substances such as asbestos, asbestiform fibers, lead, arsenic, and silica, to products marketed towards children.

85.    Thus, Plaintiffs and the Class Members purchased and continue to purchase the Talcum Products believing that such products are safe for use. Even without such affirmative statements, though, Plaintiffs and the Class Members are and were deceived into believing the Talcum Products are and were safe for use by virtue of the fact that the products are and were placed on retail store shelves and sold to the general public. Indeed, Plaintiffs and the Class Members have and had a reasonable presumption that products sold openly in a retail store are safe and legal for use. *Steroid Hormone Product Cases* (2010) 181 Cal. App. 4th 145, 156-57. And yet, as alleged above, the Talcum Products do and did contain hazardous substances not listed on the ingredients

31

list, and which are and were unlawful for sale without prior notification to the California Safe Cosmetics Program.

86.   After being exposed to such misrepresentations by Defendants, Plaintiff Louisa Gutierrez had, more or less continuously purchased the Talcum Products from Defendants, specifically baby powder from Johnson & Johnson, for her own use. She purchased these products in a variety of stores in Riverside county, including but not limited to Target, Walmart, Vons, Ralphs, CVS and Rite Aid. She, like the members of the Class, assumed that a product marketed as safe for infants would not include hazardous substances such as asbestos, asbestiform fibers, silica, arsenic, and lead. Further, there is nothing on the bottles of baby powder she purchased which would have informed her that the baby powder she purchased contained such substances. Instead, the bottles of baby powder made explicit statements that the product was safe to use. Upon learning that these products may contain hazardous substances, Plaintiff Louisa Gutierrez stopped all purchases of baby powder.

87.   Similarly being exposed to the misrepresentations alleged above, Plaintiff Debbie Luna has consistently purchased the Talcum Products until she learned that they may contain hazardous substances. She purchased both baby powder, and Shower to Shower® Talcum Products produced by both Defendants from various stores in San Diego County, including but not limited to Walmart, Target, Vons, Ralphs, CVS, and Rite Aid. She, like the members of the Class, assumed that a product marketed as safe for infants would not include hazardous substances such as asbestos, asbestiform fibers, silica, arsenic, and lead. And in fact, Ms. Luna purchased baby powder for her infant's use. Further, there is nothing on the bottles of baby powder or the Shower to Shower® products she purchased which would have informed her that the baby powder she purchased contained such substances. Instead, the bottles of baby powder made explicit statements that the product was safe to use. The bottles

of Shower to Shower® and the baby powder both list ingredients, but nowhere do the list of ingredients do Defendants state that the Talcum Products contain asbestos, asbestiform fibers, arsenic, lead, and silica. Upon learning that these products may contain such hazardous substances, Plaintiff Debbie Luna stopped all purchases of the Talcum Products.

88.   Nor are Plaintiffs alone in the being deceived. Despite clear evidence that the Talcum Products contain hazardous substances, and despite Defendants facing over 14,000 lawsuits associated with harm caused by the use of the Talcum Products, the general public, including the Class Members, continue to purchase the Talcum Products, unaware of the potential harm. As such, Plaintiffs are typical of the Class Members.

## CLASS ACTION ALLEGATIONS

89.   Plaintiffs bring this action on behalf of themselves, the general public, and all other persons similarly situated pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

90.   As defined below, Plaintiffs are members of, and seek to represent the following class:

> Plaintiffs and all persons who purchased the Talcum Products within the state of California at any time from four years prior to the filing of this complaint and ongoing until date of judgment and/or preliminary approval of class action settlement.

All Class members are hereinafter referred to as the "Class" or the "Class Members." Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.  Specifically excluded from the proposed Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled

33

by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the judicial officer or judicial officers assigned to this action, any member of the judicial officers' immediate family. Also excluded from the Class are any persons who, as of May 20, 2019, have an action pending in any Court within the State of California against one or more of the Defendants resulting the sale of and any injuries resulting from, any of the Talcum Products.

91.    This action has been brought and may be properly maintained as a class action, pursuant to the Federal Rule of Civil Procedure 23.

92.    <u>Numerosity</u>: Although Plaintiffs do not, as yet, know the exact size of the class defined above, based upon the nature of the Defendants' business, Plaintiffs are informed and believe that there are numerous members of the class defined above, and that such members are geographically dispersed throughout the State of California. Thus, the class defined above is sufficiently numerous to make joinder impracticable. The disposition of the claims of the members of the class defined above through this class action will benefit both the parties and this Court. In addition, the class defined above is readily identifiable from information and records in the possession of Defendants as well as the members of the class.

93.    <u>Existence and Predominance of Commons Questions of Fact and Law</u> – There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to each class and subclass predominate over questions that may affect individual class members, including the following:

i.     Whether the Talcum Products contain asbestos or asbestiform fibers;

ii.    Whether the Talcum Products contain arsenic;

iii.   Whether the Talcum Products contain silica;

34

iv.     Whether the Talcum Product contain lead;

v.     Whether the Defendants' marketing makes or made affirmative statements about the safety of the Talcum Products;

vi.     Whether the product name of "baby powder" constitutes an affirmative or passive statement regarding the safety of the Talcum Products;

vii.     Whether the labeling on the Talcum Products contain affirmative statements regarding the safety of the Talcum Products;

viii.     Whether the list of ingredients stated on the labels of the Talcum Products contained a notification that talc could contain substances such as asbestos, asbestiform fibers, lead, arsenic and/or silica;

ix.     Whether Defendants violated Health & Safety Code § 111792 by failing to notify the California Division of Environmental and Occupational Disease Control that the Talcum Products contain substances such as asbestos, asbestiform fibers, arsenic, and/or silica, which are known to cause cancer, birth defects, and/or injure reproductive health;

x.     Whether Defendants could lawfully sell the Talcum Products in the State of California without complying with Health & Safety Code § 111792;

xi.     Whether the sale of the Talcum Products in California at retail establishments constitutes an affirmative statement by Defendants to Plaintiffs and the Class Members that the Talcum Products were safe to use, and that Defendants had complied with all laws, including Health & Safety Code § 111792;

xii.     Whether the affirmative statement by Defendants through the sale the Talcum Products in California at retail establishments that the Talcum Products were safe to use, and that Defendants had complied with all laws, including Health & Safety Code § 111792 was a misrepresentation as

35

to the Talcum Product's source, sponsorship, approval, or certification in violation of Civil Code § 1770(a)(2);

xiii.   Whether the affirmative statement by Defendants through the sale the Talcum Products in California at retail establishments that the Talcum Products were safe to use, and that Defendants had complied with all laws, including Health & Safety Code §§ 11792 constitutes a representation, whether express or implied, that the Talcum Products have sponsorship, approval, characteristics, ingredients, uses or benefits which they do not have in violation of Civil Code § 1770(a)(5);

xiv.   Whether the affirmative statement by Defendants through the sale the Talcum Products in California at retail establishments that the Talcum Products were safe to use, and that Defendants had complied with all laws, including Health & Safety Code §§ 11792 constitutes a representation that the Talcum Products are of a particular standard, quality, or grade, or of a particular style or model, when they are of another in violation of Civil Code § 1770(a)(7);

xv.   Whether the affirmative statements by Defendants that the Talcum Products are safe for use on infants or general household use constitutes a misrepresentation as to the Talcum Products source, sponsorship, approval, or certification in violation of Civil Code § 1770(a)(2);

xvi.   Whether the affirmative statements by Defendants that the Talcum Products are safe to use on infants or general household use constitutes a representation, whether express or implied, that the Talcum Products have sponsorship, approval, characteristics, ingredients, uses or benefits which they do not have in violation of Civil Code § 1770(a)(5);

xvii.   Whether the affirmative statements by Defendants that the Talcum Products are safe to use on infants constitutes a representation that the Talcum Products are of a particular standard, quality, or grade, or of a

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

particular style or model, when they are of another in violation of Civil Code §
1770(a)(7);

xviii. Whether the product name "baby powder" constitutes
a misrepresentation as to the Talcum Products' source, sponsorship, approval,
or certification in violation of Civil Code § 1770(a)(2);

xix. Whether the product name "baby powder" constitutes
a misrepresentation, whether express or implied, that the Talcum Products
have sponsorship, approval, characteristics, ingredients, uses or benefits which
they do not have in violation of Civil Code § 1770(a)(5);

xx. Whether the product name "baby powder" constitutes
a representation that the Talcum Products are of a particular standard, quality,
or grade, or of a particular style or model, when they are of another in violation
of Civil Code § 1770(a)(7);

xxi. Whether the affirmative statements by Defendants
that the Talcum Products are and were safe to use on infants and general
household use constitutes false advertising under Business & Professions Code
§ 17500, et seq.;

xxii. Whether the sale of the Talcum Products constitutes an
unlawful business practice in violation of Business & Professions Code §
17200, et seq.;

xxiii. Whether the sale of the Talcum Products constitutes a
deceptive business practice in violation of Business & Professions Code §
17200, et seq.;

xxiv. Whether the sale of the Talcum Products constitutes an
unfair business practice in violation of Business & Professions Code § 17200,
et seq.;

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

xxv.   Whether Defendants have been unjustly enriched by their sale of the Talcum Products to Plaintiffs and the members of the Class; and,

xxvi. The   appropriate   amount   of   restitutionary disgorgement owed to Plaintiffs and the Class.

94.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Class since Plaintiffs purchased the Talcum Products from Defendants as did members of the Class.  Furthermore, Plaintiffs and all members of the Class sustained injury in fact by losing money as a result of Defendants' wrongful conduct.

95.   <u>Adequacy</u>:   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and they intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

96.   <u>Superiority</u>:  The class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and members of the Class.  Although the monetary injury suffered by each individual Class member may total several hundred dollars, injury of such magnitude is nonetheless relatively small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal

38

and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

97.    Proper and sufficient notice of this action may be provided to each class member through notice by such means as direct mail, electronic mail, publication on the internet, and/or television, radio, and/or print media outlets.

98.    Plaintiffs and the Class Members have suffered irreparable harm and damages as a result of Defendants' wrongful conduct as alleged herein, which is ongoing. Absent a representative action, Plaintiffs and each Class Member continue to be damaged, thereby allowing these violations of law to proceed without remedy, and allowing Defendants to continue their wrongful conduct.

99.    In addition, Defendants have acted or refused to act on grounds generally applicable to each member of the class, thereby making appropriate final classwide injunctive relief with respect to the class as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
#### Violation of the Consumers Legal Remedies Act
#### [Civil Code § 1750 *et seq.*]
#### (On behalf of Plaintiffs and the Class Against All Defendants)

100.  The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

101.  The Talcum Products are "goods" within the meaning of the Consumer Legal Remedies Act, Civil Code sections 1761(a) and 1770 (the "CLRA").

102.  Each Defendant is a "person" within the meaning of the CLRA,

1    Civil Code sections 1761(c) and 1770.

2        103.  Purchasers of the Talcum Products, including Plaintiffs Gutierrez
3    and Luna, and the Class, are "consumers" within the meaning of the CLRA,
4    Civil Code sections 1761(d) and 1770.

5        104.  Plaintiffs and each and every Class Member's purchases of the
6    Talcum Products constitute "transactions" within the meaning of the CLRA,
7    Civil Code sections 1761(e) and 1770.

8        105.  Defendants' unfair or deceptive acts or practices as described
9    herein, were undertaken by Defendants in transactions intended to result or
10   which resulted in the sale of goods to consumers, and were intended to induce,
11   and did in fact induce, Plaintiffs and the Class to purchase for personal use such
12   products, which they would not have otherwise purchased. Indeed, as one
13   official with the U.S. Food and Drug Administration was quoted in 1971 as
14   saying with regard to the possible presence of asbestos and/or talc containing
15   asbestiform fibers in baby powder, "No mother was going to powder her baby
16   with 1% of a known carcinogen irregardless [sic] of the large safety factor."[8]

17       106.  Defendants' practices, acts and course of conduct with respect to
18   their distribution and sale of the Talcum Products violate the CLRA in that
19   Defendants' representation that their products are safe for use on infants and
20   for general household use constitutes: (1) a misrepresentation as to the Talcum
21   Products source, sponsorship, approval, or certification in violation of Civil
22   Code § 1770(a)(2); (2) a representation, whether express or implied, that the
23   Talcum Products have sponsorship, approval, characteristics, ingredients, uses
24   or benefits which they do not have in violation of Civil Code § 1770(a)(5); and
25   (3) a representation that the Talcum Products are of a particular standard,
26   quality, or grade, or of a particular style or model, when they are of another in
27   violation of Civil Code § 1770(a)(7). Here, despite decades of evidence that the

28   [8] See Exhibit 3.

SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Talcum Products contain, or could contain hazardous substances, such as asbestos, asbestiform fibers, lead, arsenic and silica, Defendants continue to advertise that their products are safe for use with infants and general household use.

107. Defendants' practices, acts and course of conduct with respect to their distribution and sale of the Talcum Products violate the CLRA in that Defendants' use of the product name "baby powder" constitutes: (1) a misrepresentation as to the Talcum Products source, sponsorship, approval, or certification in violation of Civil Code § 1770(a)(2); (2) a representation, whether express or implied, that the Talcum Products have sponsorship, approval, characteristics, ingredients, uses or benefits which they do not have in violation of Civil Code § 1770(a)(5); and (3) a representation that the Talcum Products are of a particular standard, quality, or grade, or of a particular style or model, when they are of another in violation of Civil Code § 1770(a)(7). Here, despite decades of evidence that the Talcum Products contain, or could contain hazardous substances, such as asbestos, asbestiform fibers, lead, arsenic and silica, Defendants continue to advertise that their products are safe for use with infants and general household use.

108. Defendants' practices, acts and course of conduct in connection with its sale of the Talcum Products are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment. Further, the misrepresentation of the safety of the Talcum Products are clearly material to the determination to purchase the Talcum Products, as the potential harm to the consumer or the consumer's family is significantly greater than the value conferred by the purchase of the Talcum Products ("No mother was going to powder her baby with 1% of a known carcinogen irregardless [sic] of the large safety factor."), there are equivalent products that confer a similar benefit to the consumer that the Talcum Products provided, and, as a result, no reasonable

41

consumer, including Plaintiffs and the Class Members, would purchase the Talcum Products had they known that the Talcum Products were not, in fact, safe as Defendants, advertised, but that these products contained, or possibly contained, numerous hazardous substances.

109.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and the Class have suffered damages by not receiving what was promised to them in exchange for the purchase of the Talcum Products, which Defendants contended were safe for use on infants and/or general household use, and did not contain hazardous substances such as asbestos, asbestiform fibers, lead, arsenic, and silica.

110. By filing this Complaint, Plaintiffs seek an order enjoining Defendants from the continued sale of Talcum Products; an Order enjoining Defendants from collecting money from the Class from the sale of such products; and an Order requiring Defendants to notify the class of its violations of the CLRA and the remedy it will provide to them.  Plaintiff and the Class are entitled to equitable relief in the form of restitutionary disgorgement of all earnings, profits, compensation and benefits obtained by Defendants as a result of its violations of the CLRA, along with other appropriate relief including reasonable attorneys' fees and expenses.

**SECOND CLAIM FOR RELIEF**
**Violation of the False Advertising Law**
**[Business And Professions Code Section 17500, Et Seq.]**
**(On Behalf of Plaintiffs and the Class Against all Defendants)**

111. Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

112.  Plaintiffs bring this cause of action pursuant to California Business & Professions Code § 17500. California  Business & Profession s Code  §

42

17500 provides that it is unlawful for any person, firm, corporation or association to dispose of property or perform services, or to induce the public to enter into any obligation relating thereto, through the use of untrue or misleading statements.

113.   Plaintiffs and the Class Members purchased the Talcum Products and have suffered injury in fact and have lost money or property as a result of the unlawful, unfair, or fraudulent business practices and unfair, deceptive, untrue or misleading advertising.

114. At all times herein alleged, Defendants have committed acts of disseminating untrue and misleading statements as defined by California Business & Professions Code § 17500 by engaging in the following acts and practices with intent to induce members of the public to purchase and use the Talcum Products:(a) Representing that the Talcum Products are safe for their intended and foreseeable use and "free of asbestos," knowing that said representations were false, and concealing that the Talcum Products, or at least some of them, contain asbestos and talc containing asbestiform fibers and have a serious propensity to cause injuries to users; (b) Issuing promotional literature and commercials deceiving potential users of the Talcum Products by relaying positive information and concealing material relevant information regarding the safety and efficacy of the Talcum Products; and other unfair, unlawful and fraudulent conduct.

115.   The foregoing practices constitute false and misleading advertising within the meaning of California Business & Professions Code § 17500.

116. The acts of untrue and misleading statements by Defendants described here in above present a continuing threat to members of the public in that the acts alleged herein are continuous and ongoing, and the public will continue to suffer the harm alleged herein .

117.     As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of hundreds of millions of dollars in ill-gotten gains from Plaintiffs and the Class Members from the sale of the Talcum Products in California, sold in large part as a result of the acts and omissions described herein.

118. Pursuant to California Business & Professions Code § 17535, Plaintiffs seeks an order of this Court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

119.  Plaintiffs seek restitutionary disgorgment of the monies collected from Plaintiffs and the Class, by Defendants, and each of them, and other injunctive relief to cease such false and misleading advertising in the future.

120.  Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiffs, the Class, and the general public.

### THIRD CLAIM FOR RELIEF
**Violation of the Unfair Competition Law**
**[Business and Professions Code Section 17200, et seq.]**
**(on Behalf of Plaintiffs and the Class Against all Defendants)**

121. Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows.

122.    California Business & Professions Code § 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

123. Plaintiffs and the Class purchased the Talcum Products and have suffered injury in fact and have lost money or property as a result of the unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising.

124. The acts and practices described above violate the California Safe Cosmetic Act of 2005 (Cal. Health & Safety Code §§ 111791 et seq.) for failing to notify the California Safe Cosmetics Program that the Talcum Products contain asbestos and talc containing asbestiform fibers -- ingredients known to cause cancer. The California Safe Cosmetics Act is a California State law that was enacted in 2005 and is implemented by the California Safe Cosmetics Program in the California Department of Public Health. The Act requires companies to report cosmetics products sold within the state that contain ingredients known or suspected to cause cancer, birth defects, or other reproductive harm. The violations of Cal. Health & Safety Code §§ 11191 et seq. also satisfy and violate the "unlawful" prong of § 17200.

125. The acts and practices described above also violate the Consumer Legal Remedies Act, and the False Advertising Law, as described above, in that Defendants have represented to Plaintiffs, the Class and the general public, that their products are safe for use on infants, and for general household use. Thus, the statements made by Defendants that the Talcum Products were safe for use on infants and for general household use constitute unlawful acts within the meaning of California Business & Professions Code § 17200.

126. Further, by selling the Talcum Products openly in retail establishments throughout the State of California, Defendants violated and violate the Consumer Legal Remedies Act, by passively intimating that the Talcum Products complied with all of California's laws, and were safe to use, when, in fact, they were not. This conduct, prohibited by the CLRA, also

constitutes unlawful acts within the meaning of California Business & Professions Code § 17200.

127.  The acts and practices described above were and are also likely to mislead the general public and therefore constitute unfair business practices within the meaning of California Business & Professions Code § 17200, including unfair, unlawful, and/or fraudulent practices.

128.  The acts of untrue and misleading advertising set forth in presiding paragraphs are incorporated by reference and are, by definition, violations of California Business & Professions Code § 17200. This conduct is set forth fully herein, and includes, but is not limited to: (a) Representing that the Talcum Products are safe for their intended and foreseeable use; (b) Issuing promotional literature and commercials deceiving potential users of the Talcum Products by relaying positive information and concealing material relevant information regarding the safety and efficacy of the Talcum Products; (c) Selling the Talcum Products freely and openly without any indication of the associated health risks; and other unfair, unlawful and fraudulent conduct.

129.  These practices constitute unlawful, unfair and/or fraudulent business acts or practices, within the meaning of California Business & Professions Code § 17200. The fraudulent conduct includes representing that the Talcum Products were safe for their intended use and failing to warn Plaintiff and the Class Members of the risks associated with the Talcum Products.

130.  The unlawful, unfair and fraudulent business practices of Defendants described above present a continuing threat to members of the public in that Defendants continue to engage in the conduct described therein.

131.  As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of millions of dollars in ill-gotten gains from the sale of the

46

Talcum Products in California to Plaintiffs and the Class, sold in large part as a result of the acts and omissions described herein.

132. Plaintiffs, on behalf of themselves, and on behalf of the Class, pursuant to California Business & Professions Code § 17203, seeks an order of this court compelling the Defendants to provide restitutionary disgorgement and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

## DEMAND FOR JURY TRIAL

133. Plaintiffs hereby demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class and the general public, pray for judgment against Defendants as follows:

1. For an order certifying that this action may be maintained as a class action against Defendants, appointing Plaintiffs and their counsel to represent the Class, as alleged herein, and directing that reasonable notice of this action be given by Defendants to the members of the Class;

2. For an order awarding reimbursement, restitution and disgorgement from Defendants of the benefits unjustly conferred by Plaintiffs and the Class;

3. For an order awarding injunctive and other equitable relief;

4. For an order awarding declaratory relief;

5. For an order awarding pre- and post-judgment interest to the Class, at the highest rate allowed by law;

6. For an order awarding costs, including experts' fees, and attorneys' fees and expenses, and the costs of prosecuting this action; and

7. For an order awarding granting such other and further relief as is just

47

1   and proper.

2

3   Dated:        August 30, 2019    **POTTER HANDY LLP**

4

5                                        By: _____

6                                            Mark Potter, Esq.
                                             James M. Treglio, Esq.

7                                            Attorneys for Plaintiffs and the Class

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on August 30, 2019, a true and correct copy of Plaintiff's Second Amended Class Action Complaint and Demand for Jury Trial was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's EM/ECF System.

/s/James M. Treglio

James M. Treglio, Esq.

jimt@potterhandy.com

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

# **EXHIBIT 1**

Johnson-Johnson

*New Brunswick, N. J.*

Nov.1,1967

Subject:

Metropolitan Talc
Lot G 716
Preliminary Evaluation

The talc used for this evaluation was produced
in the Plainfield plant and was delivered to us by
Mr. Don Ferry about Oct. 1,1967.

Perfume Retention and Aroma

The Metro talc shows greater retention for
perfume than does our Vermont talc and the indications
are that the rate of escape is very close to that
devloped with Italian talc. We ran a gravimetric rate
loss test on talcs containing 1% P-5 in open dishes
and find the rate loss very close to Italian talc at
both 70 and 100F for the Metro and significantly faster
for the Vermont.  (Graphs 1 & 2)

The Metro talc does not show the chalky note
under circumstances which create that aroma in Vermont
talcs. Since the original problem in perfumery developed
at a low dose of P-5 we elected to set up a storage
test with the three talcs (Italian, Vermont,Metro) and
P-5 at 0.1% incubated at 120F for three weeks. The
Vermont article develops a chalky tone whereas the other
two did not.

The above tests lead us to believe that the
commercial dose of either P or P-5 would provide a
satisfactory aroma life with Metro type talc. Our tests
were limited in that we did not include the neutralizer
at this point.

Chemical and Physical Properties

Except for fineness the Metro talc fits the
physical characteristics which we find adequate. (Table I )
The shipment on hand is slightly on the coarse side; a
slightly increased grind should bring it into range.

Mineralogically the talc is predominantly platy
although a large percentage of the plates are broken
and lath shaped. The lath shape of some of the particles
appears to have resulted from the grinding method
since the cleavage of the crystals from a sample of the

Plaintiff's
Exhibit
J&J 124

J&J-0076514

Protected Document--Subject to Protective Order

JNJAZ55_000012423

2

rock is normal. Optically, by count, the product is at least 93% talc plus 3-5% Dolomite and 1% or less of Tremolite. The associate minerals are liberated from the talc crystals.

The talc has high slip, good flow character and is remarkably white. It is probably the whitest commercially available talc which we have observed at the 200 mesh grind level.

The carbonate Dolomite is actually calcium magnesium carbonate. This assays about 5% using the strong acid method and close to 4% using the titration method. This carbonate level requires up to 1% of sesquicitrate to maintain our historic pH limits in the finished product. A 1% neutralizer content is prohibitively high. Sesquicitrate in the 0.2% area brings the initial pH of the product close to neutral and there might be some merit in considering such a product but of course the effect would be to drift up to the higher alkaline ranges over the 18 hr control test we now use. ( Graph lll)

Talc Source and Processing

The talc ore processed in Plainfield comes from the deposit in Madoc Ontario which we explored at depth some years ago.

The Madoc deposit has a lot in common with Italian talc from the geological and mineralogical points of view. The associate minerals in the district are very similar and the crystal habit of the talcs are also very similar to the Italian situation. Thus there would be every reason to expect the two talcs to perform about the same when their processing conditions were reasonably close.

The Madoc deposit is a relatively large source of talc but it contains several grades of ore which are given different names. The highest grade up there is the Henderson section and it is that section which is presently being worked to supply the crudes for the Plainfield plant. As far as we know the reserves at Madoc were of the 150,000 ton order for the Henderson type at the 600 foot levels.

The process used to upgrade the talc is based on electrostatic separation. This is a dry process so there would be no effects resulting from wetting or flotation reagentry.

Next Steps

Mr. Russell and I shall be visiting Mr. Ferry at the Plainfield plant in the next few days. We will get an idea of the capabilities and determine what is

J&J-0076515

Protected Document--Subject to Protective Order

JNJAZ55_000012424

3

involved in reducing the carbonate level and
making arrangements for a couple tons of it
for a large scale run.

Meanwhile we have 200 lbs of the above
described Metro talc on hand here which I plan to
make available to whomever would like to run
some tests with it. Although I am personally
impressed with the laboratory scale work Russell
and I have done, a larger confirmation on a pilot
plant batch could prove useful. For example this
should be made up with whatever perfume levels
are used in the plant today and might evaluate
the holding power for the perfume in the powder
puff unit also.

Mr. Russell prepared and arranged the
attached data.

W. Ashton

J&J-0076516

Protected Document--Subject to Protective Order

JNJAZ55_000012425



J&J-0076517

JNJAZ55_000012426

Protected Document--Subject to Protective Order



J&J-0076518

JNJAZ55_000012427

Protected Document--Subject to Protective Order



J&J-0076519

JNJAZ55_000012428

Protected Document--Subject to Protective Order

UCT 3 1 1967

## TABLE I

### Physical & Chemical Data

| t | Metro #1 | Vermont S4-23 | Ital. 42771E |
|---|---|---|---|
| sture % | 0.09 | 0.07 | 0.01 |
| . in Acid % | 5.08 | 1.60 | 3.00 |
| ration % | 4.08 | 0.80 | 1.50 |
| Dens. lb/ft$^3$ | 24.7 | 25.4 | 23.4 |
| r | White | Off White Grey-Green cast | White with creamy cast |
| ness % | | | |
| -60 | 100% | 100% | 100% |
| than -100 | 99.98% | 99.90% | 100% |
| -200 | 96.85% | 99.0% | 99.7% |
| y Metals ppm | less than 10 | less than 10 | less than 10 |
| nic ppm | 0.3 | less than 2 ppm | 0.7 |
| Soluble Iron | passes | passes | passes |
| ction (2 oz) max. | 130 cc | 125 cc | 137 cc |
| nco TAPPED) min. | 72 cc | 73 cc | 72 cc |

P S P . . . . . //.

J&J-0076520

Protected Document--Subject to Protective Order

JNJAZ55_000012429

OCT 3 1 1967

## TABLE II

### Microscopic Mineralogical Assay

|  | Metro #1 | Vermont Talc S4-23 | Talc Batch 994* | Italian Talc |
|---|---|---|---|---|
| Total Talc | 93% | 99% | 94% | 93 - 99% |
| Platy | 90% | 96% | 86% | 88 - 90% |
| Nonplaty | 3% | 3% | 8% | 5 - 9% |
| Carbonates | 5 | 1 | 1-2 | 1-3 |
| Tremolite | 1 | trace | trace | 1-2 |
| Serpentine | trace | trace | 4 | none |
| Opaques | < 1 | trace | trace | trace |

*Produced August 21, 1967 at West Windsor

R.S. Russell

J&J-0076521

Protected Document--Subject to Protective Order

JNJAZ55_000012430

*Johnson & Johnson*

**New Brunswick, N. J.**
April 9, 1969

**Subject:** Alternate Domestic Talc Sources
File No. 101

Dr. G. Hildick-Smith

Pete, we have to firm up the position the Com-
pany should have on the presence of the mineral
Tremolite in talc.  Your staff will have to do
this for us since the objections to that mineral
have been mainly medical or clinical as opposed
to chemical or physical.

The reason we have to firm up our position is
that we have moved into high gear on some al-
ternate talc sources and it is normal to find
different levels of Tremolite in many U.S. talcs.
We are looking at some of those.

Historically, in our Company, Tremolite has been
bad because it has needle type crystals.  Our
position has been that these can stand on end,
penetrate the skin, and cause irritation; con-
sequently, talcs exceeding trace contents have
never been approved.  Over the past year or two,
the medical literature has made reference to
potential hazards of talcs containing Tremolite
and I have seen some articles under the umbra
of environmental health agencies from here and
abroad which pinpoint severe objections to that
mineral in talcum powders.

Unfortunately, Tremolite has different varieties
and can be easily confused with other members of
the mineral class into which it falls.  Chemi-
cally, it is mainly a calcium silicate with
varying amounts of magnesium silicate and some-
times it carries iron with it in minor amounts.
Some varieties of it match asbestos, and I gather there
has been a lot of attention given to the hazards
of inhaling minerals of that type lately.

Plaintiff's
Exhibit
J&J 202

Protected Document--Subject to Protective Order

JNJAZ55_000001073

-2-

There is nothing we can do about the confused
state of affairs on Tremolite from the minera-
logical and chemical points of view as far as
historic literature is concerned.

The question is...How bad is Tremolite medically,
and how much of it can safely be in a talc base
we might develop?

W. H. Ashton

pm
cc:   Dr. R. A. Fuller
      Dr. E. R. L. Gaughran
      Mr. R. J. Mortimer
      Dr. T. H. Shelley
      Dr. R. L. Sundberg

Protected Document--Subject to Protective Order

JNJAZ55_000001074

# EXHIBIT 2

*Johnson&Johnson*

***New Brunswick, N. J.***

April 15, 1969

***Subject:***   ALTERNATE DOMESTIC TALC SOURCES

Project Code #101

Mr. W. H. Ashton:

Your inquiry of April 9th, 1969 addressed to Dr. G. Hildick-Smith has been referred to my attention for reply.

Over the years, I have reviewed the literature on the hazards relating to the inhalation of talc particles on several different occasions. In your memorandum, you indicate that Tremolite does have needle-type crystals and that our position has been that these could penetrate the skin and cause irritation. Actually, to the best of my knowledge, we have no factual information on this subject. It would seem logical that it could occur, although whether or not it would be of clinical significance would be conjectural.

We have been concerned to a much greater extent with regard to possible dangers relative to the inhalation of the talc with a spicule or needle-like crystalline structure as compared with the flat, platelet-type of crystalline structure. There are reports in the literature concerning talcosis which, as you know, is a form of pneumoconiosis attributed to the inhalation of talc. Reported studies have suggested that this does not occur in connection with the flat, platelet-type of talc, but does occur in connection with the spicule-type of crystalline structure characteristic of Tremolite. The reported instances have been extremely few but have, without exception, involved inhalations of high concentrations on an occupational basis of many years duration. Furthermore, we have occasionally received inquiries from various individuals, including General Johnson and several pediatricians, expressing concern over the possibility of the adverse effects on the lungs of babies or mothers who might inhale any substantial amounts of our talc formulations. In the past, we have replied to the effect that since our talc is essentially all of the platelet-type of crystalline structure, and is of a size which would not be likely to enter the pulmonary alveoli, we would not regard the usage of our powders as presenting any hazard. Obviously, if we do include Tremolite in more than unavoidable trace amounts, this sort of negation of such inquiries could no longer pertain.

Plaintiff's
Exhibit
J&J 195

JNJNL61_000001534

- 2 -

Mr. W. H. Ashton                                   April 15th, 1969


Upon various occasions we have discussed the possibility of carrying out studies on animals which might provide factual information with regard to whether or not variable exposures to talc suspended in the environmental atmosphere might be productive of fibrotic and/or inflammatory reactions in lungs. For a variety of reasons, these have never been carried out here.

Since pulmonary diseases, including inflammatory, fibroplastic, and neoplastic types, appear to be on the increase, it would seem to be prudent to limit any possible content of Tremolite in our powder formulations to an absolute minimum. To the best of my knowledge, we have never been faced with any litigation involving either skin or lung penetration by our talc formulations. Some years ago, we were faced with a more or less serious problem resulting from what we consider to have been an unjust accusation of danger due to the presence of a small amount of boric acid in our talc. This created such a furor that we were more or less compelled to remove boric acid from the formulation. It is conceivable that a similar situation might eventually arise if it became known that our talc formulations contained any significant amount of Tremolite. Since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that we could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations. It might be that someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise.

It is my personal feeling that until we have at least substantial evidence, based on animal work, to the effect that the presence of Tremolite in our talc does not produce adverse effects, we should not extend its usage beyond an absolute minimum previously mentioned.

                                   T. M. Thompson, M.D.

TMT:JAG

cc: Dr. R. A. Fuller
    Dr. Gavin Hildick-Smith
    Mr. W. J. Ryan
    Dr. G. H. Lord
    Dr. J. E. Willson
    Dr. J. Bothwell

Protected Document--Subject to Protective Order

# **EXHIBIT 3**

*Johnson & Johnson*

BABY PRODUCTS COMPANY

February 13, 1975

SUBJECT:   CTFA Talc Subcommittee Meeting
           with Food and Drug Administration
           Washington, D.C. February 7, 1975

To:   Distribution

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dr. . . . . .
. . . . . . . . the following is a summary of the major
discussions.

This meeting was held in Dr. R.N. Schaffner's office on
February 7, 1975 at 1:00 PM.  Representing FDA were:
Dr. R. Schaffner, Mr. H. Eiermann, Mr. H. Davis, Dr. W.
Horowitz and Dr. Yates.  The CTFA was represented by:
Dr. N. Estrin, Mr. G. Sandland, Dr. M. Berdick, Dr. R.
Rolle and G. Lee.

Dr. Estrin introduced Mr. Sandland as chairman of the CTFA
Talc Subcommittee and indicated that the purpose of our
meeting was to present the analytical methodology which
had been developed by the CTFA Task Force as applicable
to cosmetic talcs.

FDA indicated that there had been no eminent plans to
publish new proposed methodology in this regard and did
not give us the impression that this matter was being
assigned any urgency.  They reported no further work with
the optical microscopy method.  Dr. Horowitz was asked by
Dr. Schaffner to elaborate on the only apparent area of
analytical activity which is being directed towards Food
Regulatory.  This is being carried out under contract by
the Franklin Institute, who are investigating an SEM method.
They're attempting to develop methodology for detecting low
levels of asbestos contamination and have experienced
difficulty in presenting a uniform sample to the SEM.  It's
expected that this study may take one to two years.  Any
further steps to be taken with regards to Food Regulation
will therefore have to wait on developments from the
Franklin Institute.

When questioned as to FDA efforts and progress in the
approach of "concentrating asbestos" to increase the level

Plaintiff's
Exhibit
J&J 60

J&J-0089804

JNJAZ55_000013775

Protected Document--Subject to Protective Order

-2-

of sensitivity, Dr. Yates replied in a tone of frustration
that all attempts have met with failure; they had investi-
gated heavy density liquid separation.  Dr. Yates did not
state that efforts would be continued in this direction,
but we volunteered help in evaluating methodology should
they develop something.

Dr. Rolle outlined the proposed CTFA methods and the
expected limits of detection.  It was emphasized to the FDA
that these were methods evaluated and recommended for
cosmetic talc and would be practical to apply for industrial
monitoring purposes.  Dr. Rolle highlighted the fact that
any natural-occurring chrysotile in talc for his methods
of identification.  Dr. Rolle further supported this by stating
that J&J Research-Fulton has examined numerous talcs from
around the world for cosmetics application and have not
found chrysotile.  The writer reiterated similar J&J
experience with domestic and overseas talcs.  Dr. Schaffner
agreed that no one has purported to have seen chrysotile
in cosmetic talc except Professor Lewin.  At this point,
Dr. Schaffner asked us what Professor Lewin was doing
(if anything) in talc analysis.  Dr. Rolle outlined a
conversation he had had with Professor Lewin the day
before and Dr. Schaffner directed Dr. Horowitz to interview
Professor Lewin for his most current views regarding
chrysotile in talc.  Dr. Berdick made the point that if
chrysotile is not expected to be found in talc, then the
FDA should not propose regulations to cover chrysotile.
After an exchange of philosophy, where Mr. Eiermann took
a strong stand for chrysotile in talc regulation, Dr.
Schaffner suggested that if the CTFA would submit
supporting data attesting to the absence of chrysotile
in talc the FDA would take the matter under consideration.
Mr. Sandland indicated that the CTFA will be proposing
self-regulatory action by  amending its present CTFA Talc
Standard to include the asbestiform tremolite proposal.

Mr. G. Sandland stated that a regulation of 1% asbestos
in talc was not only achievable by throughly tested methods,
but also gave a safety factor of 48,300 (Sivertson calcula-
tion).  Mr. Eiermann bluntly said that the calculation was
wrong since the standard of 2 fibers/cc. is not a time
weighted average.  Before we had a chance for rebuttal
Dr. Schaffner said that the Sivertson calculation was
foolish since no mother was going to powder her baby with
1% of a known carcinogen irregardless of the large safety
factor.  Because of Dr. Schaffner's strong stand we did
not correct Mr. Eiermann's misunderstanding of the
calculation.

J&J-0089805

Protected Document--Subject to Protective Order                                        JNJAZ55_000013776

-3-

Dr. Schaffner emphasized that there is an ultimate and
more important need for talc clinical safety data in
order to satisfy the consumerist advocates.  The writer
assured him that this would be forthcoming from J&J.

<mark>Copies of the DTA and X-Ray Diffraction Detection
Procedures together with the Sivertson Report "An Estimate
of a Safe Level of Asbestos in Baby Powder Talc" were
distributed to the FDA representatives</mark> and the meeting
was closed with Dr. Estrin thanking the FDA for the
opportunity of exchange and discussion.

The general impression received by the writer was that
the FDA was not anxious to publish further proposals
relative to "asbestos-in-talc" pending outcome of the
Franklin Institute Study, as long as the consumerist
advocates remain quiescent.  It is also evident that the
FDA would depend on clinical data to defend the safety
of talc.

In a post-meeting caucus of the CTFA attendees, it was
agreed that the CTFA would proceed to compile information
from consultants and manufacturers which attest to the fact
that chrysotile has never been found in cosmetic talcs
and submit this to the FDA.

G. Lee

paj

Protected Document--Subject to Protective Order

J&J-0089806

JNJAZ55_000013777